# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued December 10, 2014        Decided May 15, 2015

No. 13-5308

RYAN BARTON LASH,
APPELLANT

v.

JENNIFER LEMKE, OFFICER, IN HER INDIVIDUAL CAPACITY AND
TODD REID, SERGEANT, IN HIS INDIVIDUAL CAPACITY,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:12-cv-00822)

*Jeffrey L. Light* argued the cause and filed the briefs for appellant. *Edward J. Elder* entered an appearance.

*Marina U. Braswell*, Assistant U.S. Attorney, argued the cause for appellees. With her on the brief were *Ronald C. Machen Jr.*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney.

Before: GARLAND, *Chief Judge*, and GRIFFITH and KAVANAUGH, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*:

Police officers tried to arrest Ryan Lash after he confronted them within the Occupy D.C. encampment at McPherson Square in downtown Washington, D.C. Lash actively resisted arrest, and one officer used a Taser to subdue him. Lash sued the officers alleging violations of his First and Fourth Amendment rights. The district court granted summary judgment to the officers, concluding they were protected by qualified immunity against Lash's claims because the officer's use of the Taser did not violate the Constitution. We also conclude that qualified immunity shields the officers from Lash's Fourth Amendment claim, but on a different basis that does not require us to take up the constitutional issue the district court reached: A person actively resisting arrest does not have a clearly established right against a single use of a Taser to subdue him. We also grant summary judgment to the officers on Lash's First Amendment claim because he failed to meaningfully advance the argument on appeal.

I

During the winter of 2011 to 2012, participants in the Occupy D.C. movement took up residence in McPherson Square, living in tents and other shelters. On January 29, 2012, United States Park Police (USPP) officers entered the square to post notices advising the protestors that USPP would begin enforcing anti-camping regulations the following day. The USPP officers were under the supervision of Sergeant Todd Reid, a defendant here. As the officers distributed notices through the park, they were followed by a crowd of protestors shouting objections and profanities. Several members of the crowd videorecorded this

confrontation. Those recordings are part of the record on appeal, and we rely on them as we describe what followed.

Lash, the plaintiff here, emerged from his tent in the encampment into this tense situation. He confronted the police officers, challenged their presence and purpose in the park, shouted profanities, and tore down some of the notices they had posted. The officers ordered Lash to stop removing the notices, and he complied. But as he walked away, Lash again shouted profanities at the police.

A number of USPP officers followed him. Among their number were Officer Jennifer Lemke, also a defendant here, and Officers Frank Hilsher and Tiffany Reed. Lash, observing the officers walking after him, began to retreat through a group of tents, insisting with increasing agitation that he had "done nothing wrong" and demanding to know why they were "coming at" him. Some officers followed Lash's route among the tents. Other officers surrounded the area of the park through which Lash was walking. Lash continued to retreat across the encampment and to protest his innocence.

Officer Tiffany Reed, who had been following Lash as he hurried through the tents, stepped up behind Lash and seized his arms from the rear. Lash pulled his arms away and held them in front of his body, continuing to walk away as he insisted that he was innocent. Reed again sought to restrain Lash from behind and Lash again pulled his arms away from her. Reed then took hold of Lash's left arm while Hilsher approached and seized his right arm. Lemke approached at the same time and drew her Taser from its holster, holding it ready.

Though Lash's arms were now held by two different officers, he continued to struggle to keep his feet while Reed

and Hilsher worked for several moments to gain control of him. Lemke, standing nearby and behind the trio, fired her Taser into Lash's lower back. He fell to the ground, and the officers handcuffed him.

The officers carried Lash, now handcuffed, to a nearby police car. Lash refused to enter the police car, so the officers called for a police van. When the van arrived, the officers left the scene with Lash, who was charged with disorderly conduct. Lash contends that he has suffered a variety of painful and debilitating effects from being tased.

Lash filed the complaint in this action against Officer Lemke and Sergeant Reid in their individual capacities pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). The complaint alleged that Lemke's use of the Taser constituted excessive force in violation of Lash's Fourth Amendment rights and was motivated by retaliatory animus against his protected expression in violation of his First Amendment rights as well. Reid, he alleged, was liable for failing either to supervise the situation adequately or to intervene to prevent Lemke's use of excessive force.[1]

---

[1] Lash also alleged that his arrest, as distinct from the force used in effecting his arrest, constituted a separate First Amendment violation because it too was motivated by retaliatory animus. After Lash filed his complaint but before the district court ruled below, the Supreme Court held in *Reichle v. Howards* that "it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation" even if also motivated by retaliatory animus. 132 S. Ct. 2088, 2097 (2012). Lash conceded below that probable cause existed for his arrest and so *Reichle* precludes any First Amendment claim arising on that score. He does not argue otherwise here.

5

The officers moved to dismiss or, in the alternative, for summary judgment, arguing that qualified immunity should shield them from liability. The district court agreed and granted summary judgment, concluding that neither of Lash's claims could survive because, under the circumstances, the use of the Taser was not excessive force. *Lash v. Lemke*, 971 F. Supp. 2d 85, 93-98 (D.D.C. 2013). Lash appealed. We have jurisdiction under 28 U.S.C. § 1291. *See Mitchell v. Forsyth*, 472 U.S. 511, 524-30 (1985).

II

We review the grant of summary judgment on the basis of qualified immunity de novo. *Johnson v. District of Columbia*, 528 F.3d 969, 973 (D.C. Cir. 2008).

A

Because the officers' conduct here did not violate any clearly established law, they have qualified immunity against Lash's Fourth Amendment claim.[2] Qualified immunity exists to protect officers "from undue interference with their duties and from potentially disabling threats of liability," *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982), and applies in *Bivens* actions as it does elsewhere, *Atherton v. District of Columbia*, 567 F.3d 672, 689 (D.C. Cir. 2009). An official who asserts a qualified immunity defense can only be held liable if the plaintiff suing him establishes that the official "violated a constitutional right" that "was clearly established" at the time. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

---

[2] There is no question that Lash may pursue an excessive force claim under *Bivens*. 403 U.S. at 395-96.

We have "discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011). Determining that a constitutional right exists and has been abridged by official conduct is not only difficult at times, but asks much of a court that should resolve matters on constitutional grounds only when there is no other way to do so. *See Pearson v. Callahan*, 555 U.S. 223, 241 (2009). In some cases, it is easier for a court to see that the claimed right, whether it exists or not, is by no means "clearly established." *Id.* at 237. This is such a case and we will accept the invitation of the Court in *Pearson* to dispose of this suit by holding that the conduct of the officers in arresting Lash did not violate any clearly established law. Thus we need not consider whether the district court was right to conclude that the use of a Taser against Lash in these circumstances was constitutionally permissible.

1

Qualified immunity applies because the defendants' conduct did not violate clearly established law.

For a right to be clearly established, its "contours [must be] sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (internal citation omitted). In addition, the Court "'ha[s] repeatedly told courts . . . not to define clearly established law at a high level of generality,' . . . since doing so avoids the crucial question

whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff*, 134 S. Ct. at 2023 (quoting *al-Kidd*, 131 S. Ct. at 2084). Thus the "clearly established" prong of qualified immunity analysis requires us to determine the right at issue "in light of the specific context of the case," not simply as a statement of general legal principles. *Saucier*, 533 U.S. at 201.

Because this case was decided at summary judgment, we must draw reasonable factual inferences in the light most favorable to Lash, the nonmovant. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court has cautioned us that we "must take care not to define a case's context in a manner that imports genuinely disputed factual propositions." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (internal quotation marks omitted). Nonetheless, our obligation to view the facts "in the light most favorable to the nonmoving party" only attaches "if there is a 'genuine' dispute as to those facts." *Scott*, 550 U.S. at 380 (quoting Fed. R. Civ. P. 56(c)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* And when a nonmovant's account of the facts is "utterly discredited" by the clear evidence provided by a videorecording, the Court has instructed us not to rely on a "visible fiction" but rather "view[] the facts in the light depicted by" the video record. *Id.* at 380-81.

The question of "context" here turns principally on whether Lash was resisting arrest at the time he was tased. Lash has averred by affidavit that he did not resist arrest. Because this case comes to us at summary judgment, we have a duty to draw all inferences "in favor of the nonmovant" and may not resolve disputed fact issues. *Tolan*, 134 S. Ct. at

1866. Thus Lash insists, relying on *Tolan*, that we cannot define the "context" for this case by concluding as a matter of law that he was resisting arrest. Doing so, he argues, would "import[] genuinely disputed factual propositions" into the qualified immunity analysis, exactly as *Tolan* forbids us to do. *Id.* We disagree: Here, there is no genuine dispute regarding Lash's conduct. Multiple videorecordings of the episode make perfectly clear that Lash resisted the officers' efforts to arrest him. He pulled his arms free from the officers' efforts to restrain them twice in succession. The first of these, Lash argues in his affidavit, was no more than a natural reaction to being seized when he did not know who had seized him. But Lash does not even acknowledge, much less attempt to justify, the second occasion on which he pulled away. Much worse, Lash further claims that as soon as he realized that officers were trying to arrest him he immediately acquiesced and allowed them to put his arms behind his back. And in his brief he insists that the officers "began to place [his arms] behind his back" while he "continued to insist he had done nothing wrong." But it is plain from multiple videorecordings that each of these claims is a "visible fiction." *Scott*, 550 U.S. at 381. Even when each of Lash's arms was firmly held by a uniformed USPP officer, Lash continued to resist, straining to remain upright despite the officers' efforts to destabilize him and force him to the ground. Nor did Lash allow the officers to move his arms behind his back before handcuffing him. His arms remained extended even as the officers attempted to restrain him and were never pinned until after Lemke used her Taser. Just as in *Scott*, the video record here makes the normal factual solicitude for the nonmovant at summary judgment both unnecessary and inappropriate. No matter what Lash claims now, we know to a certainty that he resisted arrest because we can see him doing so.

Lash argues that we may not rely on the videorecordings in this way because they "cannot fully convey everything that people at the scene felt" such as "how much force one person is exerting" or "the level of detail a person will experience in the moment." This is no argument at all. The Supreme Court has explained that we determine whether a right is clearly established based on the "objective legal reasonableness of an official's acts," *Harlow*, 457 U.S. at 819, protecting officers from liability unless "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted," *Saucier*, 533 U.S. at 202. Subjective factors like those Lash identifies here cannot shed any light on whether a reasonable officer in these circumstances would have believed her actions violated Lash's clearly established rights. It is that objective test, not Lash's knowledge or Lemke's thoughts, that determines the scope of qualified immunity. The videorecordings in the record provide us all we need to determine what a reasonable officer would have known at the scene. And we do not hesitate to conclude from the videorecording that there is "no genuine issue of material fact" regarding Lash's active resistance. *Scott*, 550 U.S. at 380 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (emphasis omitted).

## 2

In light of the foregoing, we must determine whether it was clearly established that the single use of a Taser by arresting officers violated the Fourth Amendment rights of a person actively resisting arrest. A right is clearly established when "'existing precedent [has] placed the statutory or constitutional question beyond debate.'" *Taylor v. Reilly*, 685 F.3d 1110, 1114 (D.C. Cir. 2012) (quoting *al-Kidd*, 131 S. Ct. at 2083). We find clearly established rights by looking "'to cases from the Supreme Court and this court, as well as to

cases from other courts exhibiting a consensus view,' . . . if there is one." *Bame v. Dillard*, 637 F.3d 380, 384 (D.C. Cir. 2011), *as amended* (Mar. 29, 2011) (quoting *Johnson*, 528 F.3d at 976). "The facts of such cases need not be materially similar . . . but have only to show that the state of the law [at the time of the incident] gave [the officer] fair warning that [his alleged misconduct] . . . was unconstitutional." *Id.* (alterations in *Bame*) (internal quotation marks omitted).

No such clearly established right existed. The officers could not have been on notice that using a Taser in these circumstances would violate Lash's Fourth Amendment rights. Though there is no case from the Supreme Court or our court that is on point, consulting the decisions of our sister circuits reveals a telling pattern. The use of a Taser against a person who is not resisting arrest or merely passively resisting may violate that person's rights. *See, e.g.*, *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009). The use of a Taser may also violate an individual's rights even in the face of resistance if the officer uses the Taser to excess, such as firing multiple times after the officers have gained control of the scene. *See, e.g.*, *Meyers v. Baltimore Cnty., Md.*, 713 F.3d 723, 735 (4th Cir. 2013). But "[t]here is no clearly established right for a suspect who actively resists and refuses to be handcuffed to be free from a Taser application." *Goodwin v. City of Painesville*, 781 F.3d 314, 325 (6th Cir. 2015) (internal quotation marks omitted). The Seventh Circuit, surveying the state of the law, found that "[c]ourts generally hold that the use of a [T]aser against an actively resisting suspect either does not violate clearly established law or is constitutionally reasonable." *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 727 (7th Cir. 2013). The Sixth Circuit reached the same result. *See Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 509-10 (6th Cir. 2012) (observing that courts generally find that "[i]f a suspect

actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a [T]aser to subdue him"). *See also Aldaba v. Pickens*, 777 F.3d 1148, 1158 (10th Cir. 2015) (finding that "where the subject actively resisted a seizure, whether by physically struggling with an officer or by disobeying direct orders, courts have held either that no constitutional violation occurred or that the right not to be tased in these circumstances was not clearly established"). And our own examination of the cases similarly has found that officers who tased individuals actively resisting arrest had qualified immunity against excessive force claims. *See, e.g.*, *De Boise v. Taser Int'l, Inc.*, 760 F.3d 892, 897 (8th Cir. 2014); *Buchanan v. Gulfport Police Dep't*, 530 F. App'x 307, 314 (5th Cir. 2013); *Meyers*, 713 F.3d at 733; *Hoyt v. Cooks,* 672 F.3d 972, 979-80 (11th Cir. 2012). Because this right is still not clearly established today, a reasonable officer in January 2012 would certainly have been justified in believing that she could use a Taser a single time against a resisting suspect.

Lash makes only one argument, raised for the first time in his reply brief, that the officers' conduct violated clearly established law. He relies on a negative inference from a 2004 decision of the Eleventh Circuit in which that court held that a single Taser discharge against a "hostile, belligerent, and uncooperative" suspect did not constitute excessive force. *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004). *Draper* examined a traffic stop in which the driver, increasingly frustrated at an officer's questions, became "belligerent, gestured animatedly, continuously paced, appeared very excited, and spoke loudly." *Id.* at 1272-73. After the driver had disobeyed an order multiple times and ignored a warning that he was risking arrest, the officer tased him. *Id.* at 1273-74. The court found that the use of the Taser did not violate the Constitution because "the amount of

force . . . was reasonably proportionate to the need for force." *Id.* at 1278. Lash seems to suggest that because he was less obstreperous than the arrestee in *Draper* and did not ignore a warning or refuse to comply with orders, *Draper* should have made it clear that Lash's behavior did not warrant the use of a Taser. We think *Draper* counsels for our conclusion, not against it. Though Lash's confrontation with the USPP officers was shorter than the standoff with police in *Draper*, Lash actively resisted arrest even after officers actually had their hands on him. *Draper*, in contrast, involved only aggressive conduct, agitation, and refusal to comply with police orders. There, police did not even attempt to subdue and handcuff the arrestee before discharging a Taser against him. The USPP officers here had already made multiple successive attempts to restrain Lash and were still struggling with his physical resistance when Lemke tased him. If anything, reading *Draper* could have led a reasonable officer to feel confident that the force used in this case was reasonable, not the opposite. At a minimum, *Draper* certainly did not establish beyond doubt that using a Taser a single time on someone behaving as Lash did would violate his rights.

The strongest, though ultimately futile, argument we have found for the proposition that the officers' conduct violated clearly established law comes from *Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011) (en banc). There the Ninth Circuit considered two consolidated cases regarding the use of a Taser during arrests. In the first case, a pregnant woman, pulled over as part of a traffic stop, refused to sign a citation and to get out of her car; officers tased her three times before handcuffing her. This arrestee, the Ninth Circuit concluded, "engaged in some resistance to arrest" when she "stiffened her body and clutched her steering wheel to frustrate the officers' efforts to remove her from her car." *Id.* at 445. In the second case, an officer trying to arrest an individual suspected

of domestic violence tased the suspect's wife when she did not move out of the officer's way. *Id.* at 449. This individual "minimally resisted . . . arrest" when she "extended [her] arm . . . to protect her own body" from contact with the advancing officer; the Ninth Circuit noted that this "minimal[]" resistance was more akin to "failure to facilitate an arrest," not "active resistance to arrest," because the advancing officer was seeking to arrest her husband, not the woman herself. *Id.* at 449-50. In both cases the Ninth Circuit held that using a Taser violated the arrestee's rights, though it also concluded that at the time of the episodes (November 2004 and August 2006, respectively) no clearly established law put officers on notice that using a Taser in those circumstances would violate the Constitution. *Id.* at 444-52.

Even if *Mattos* were manifestly contrary to the many cases we discussed above, such an outlier would not invalidate broad agreement among other circuits. The "'consensus view'" we have found necessary to create a clearly established right for qualified immunity purposes requires more than a single decision departing from an otherwise consistent pattern. *Bame*, 637 F.3d at 384 (quoting *Johnson*, 528 F.3d at 976). But more to the point, *Mattos* does not actually contradict the other cases on which we rely. In *Mattos* the Ninth Circuit carefully noted that the level of resistance offered by both arrestees was quite limited: "some resistance" in one case and "minimal resistance," ultimately more akin to "failure to facilitate an arrest" than "active resistance to arrest," in the other. Lash's case offers a different context. Lash twice evaded the officer's efforts to seize him and, even after two officers held his arms, continued struggling between them and fighting against their efforts to force him to the ground. This was not "some" or "minimal" resistance, much less a failure to facilitate the arrest of another. As the video record makes clear, Lash was

actively resisting arrest in the face of increasing police efforts to control him without resorting to more substantial force. *Mattos* was a different case and in consequence the Ninth Circuit's holding could not have put these officers on notice that using a Taser in this "specific context," *Saucier*, 533 U.S. at 201, would violate Lash's rights. And even if *Mattos* had dealt with closely analogous facts, that decision alone would be outweighed by the consensus position: No clearly established right is violated when an officer uses a Taser a single time against an individual actively resisting arrest.

Thus the force used here violated no clearly established law, regardless of whether it may have violated the Fourth Amendment. For that reason Lemke and Reid have qualified immunity as to Lash's Fourth Amendment claim.

B

Lash's First Amendment retaliatory force claim fares no better, though for the different reason that he simply did not argue it on appeal. Because the officers have not argued on appeal that *Bivens* does not apply here, we will "assume, without deciding," that Lash's First Amendment retaliatory force claim "is actionable under *Bivens*." *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009). *Compare Wood v. Moss*, 134 S. Ct. 2056, 2066 (2014), *with Hartman v. Moore*, 547 U.S. 250, 256 (2006). Even so, Lash's First Amendment claim is doomed by his failure to provide any meaningful argument on appeal in support of it. His opening brief offers a single paragraph regarding the First Amendment with only two sentences devoted to legal argument. He insists that because the force used against him was, in his judgment, excessive, his First Amendment claim in connection with that force should survive. He did not refer to the First Amendment at all on reply. As a general matter, we decline to consider

arguments made in such a perfunctory fashion. *See, e.g.*, *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work." (citation omitted)).

Admittedly, Lash framed his First Amendment argument in the context of the district court's decision dismissing that claim on the basis that the force used against him was not excessive. But even had we decided that the use of the Taser did constitute excessive force under the Fourth Amendment, Lash's argument would have remained inadequate. A plaintiff pressing a First Amendment retaliatory force claim must show, among other things, that the officer who used force against him had "'retaliatory animus.'" *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 191 n.23 (D.C. Cir. 2006) (quoting *Hartman*, 547 U.S. at 260). But Lash did not argue that a jury could reasonably find in his favor on the presence of a retaliatory motive. He drew our attention to nothing in the record, and we have found nothing ourselves, that suggests Lemke's use of force was retaliatory. It is not this court's obligation to resolve issues when the party concerned argues them so cursorily. *Wash. Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 39 (D.C. Cir. 1997) ("Because the District raises this issue in such a cursory fashion, we decline to resolve it." (internal quotation marks omitted)). For this reason we grant summary judgment to the officers on Lash's First Amendment claim as well.[3]

---

[3] Lash also argues that Sergeant Reid's affidavit submitted in support of the officers' motion for summary judgment suffered from various flaws. As we do not rely on that affidavit in our decision here, however, we need not consider whether, as Lash contends, Reid failed to provide support for his testimony or included inappropriate legal conclusions.

## III

For the foregoing reasons, we affirm the district court's grant of summary judgment for the defendants.